1  Ronald S. Caswell (SBN 161113)
   Caswell & Cannon
2  1625 Warnall Avenue, Suite 100
3  Los Angeles, California 90024
   Telephone:  (310) 282-8150
4  Facsimile:  (310) 282-8140

5  Todd J. Harlow (Pro Hac Vice)
6  Cowles & Thompson, P.C.
   901 Main Street, Suite 3900
7  Dallas, Texas 75202
   Telephone: (214) 672-2138
8  Facsimile: (214) 672-2338

9   Attorneys for Qui Tam Plaintiff,
    MARCELLUS TAYLOR
10

11            UNITED STATES DISTRICT COURT

12          CENTRAL DISTRICT OF CALIFORNIA

13  THE CITY OF LOS ANGELES, LOS        )
14  ANGELES FIRE & POLICE PENSION *ex*  )
    *rel* MARCELLUS TAYLOR,             )       CASE NO. 2:15-cv-05343-RGK-RAOx
15                                      )
16            Plaintiff,                )       **PLAINTIFF'S SECOND**
                                        )       **AMENDED COMPLAINT**
17                                      )
                                        )
18  vs.                                 )
19                                      )
20  DEUTSCHE BANK, AG; DBAH CAPITAL,    )
    LLC; and DB INVESTMENT              )
21  MANAGERS, INC.,                     )
                                        )
22            Defendants.               )
23  _____ )

24        Plaintiff City of Los Angeles, Los Angeles Fire & Police Pensions ("LAFP"), ex
25  rel. Marcellus Taylor, qui tam Plaintiff, files its Second Amended Complaint for violations
26  of the California False Claims Act ("the Act") against Deutsche Bank, AG, DBAH
27  Capital, LLC, and  DB Investment Managers, Inc. (collectively, "Deutsche Bank" or
28  "Defendants").  In support, Plaintiff respectfully alleges as follows:

1512280.1

# I.
## INTRODUCTION

1.      Plaintiff seeks to hold Deutsche Bank accountable for the hundreds of millions of dollars in damages caused to LAFP through Deutsche Bank's perpetration of a massive "pay-to-play" investment fraud similar to the fraud perpetrated on public pension funds located in New York, New Mexico, and elsewhere.

2.      The fraud works like this: investment fund managers like DB Investment defraud public pension funds by entering into outsized placement agent agreements with politically-connected investment fund placement agents.   The placement agents then leverage their political influence to secure placements of public pension capital in investments managed by the fund managers who have "paid to play" by hiring those placement agents.  The taxpayers whose funds are "placed" in these investments are the ultimate losers, as their money is invested in sub-par investment products chosen not because they are wise investments, but instead because those investments are pushed by placement agents who have political connections with public pension officials that legitimate fund managers lack.

3.      Here, Deutsche Bank perpetrated its fraud on LAFP by leveraging (1) its controlling interest in Aldus Equity, LLC ("Aldus"), the private equity consulting firm LAFP hired to make investments for its private equity portfolio, and (2) Deutsche Bank's series of illicit connections to politically-connected placement agents, including New Mexico-based placement agent Marc Correra and his California-based cronies Julio Ramirez, Dan Weinstein and Marvin Rosen.

4.      From 2007 through 2009, Deutsche Bank and these corrupt placement agents fraudulently steered $355 million of LAFP capital into twelve separate private equity funds marketed by those placement agents.  Throughout this entire time, Deutsche Bank failed to disclose its relationships with these placement agents to LAFP, and concealed the fact that Deutsche Bank was basing its investment recommendations on funds' relationships with these corrupt placement agents, rather than the best interests of LAFP.

PLAINTIFF'S SECOND AMENDED QUI TAM COMPLAINT

5.      This lawsuit positions LAFP to recover the full damages sustained from investment fraud losses, and will prevent the most corrupt player in this scheme, Deutsche Bank, from avoiding its fair share of accountability.  As explained herein, Deutsche Bank's conduct is deplorable, and merits recovery of treble damages for the $355 million in damages Deutsche Bank caused while lining its own pockets with taxpayers' money.

## II.
## PARTIES

6.      Plaintiff is the City of Los Angeles, a political subdivision of the State of California.  Los Angeles Fire and Police Pensions ("LAFP") is a city agency that administers defined retirement plan benefits for all sworn employees of the City of Los Angeles, including its fire fighters, police, and certain port police.  These hardworking civil servants are the ultimate beneficiaries of this action, as LAFP is charged with investing their pension funds.

7.      The *qui tam* plaintiff, Marcellus Taylor, is a former Aldus partner who was forced out of Aldus by Deutsche Bank in December 2007 so that it could implement the massive fraud alleged herein.  For reasons discussed *infra*, Mr. Taylor is an "original source" as that term is defined in Section 12652(d)(3)(B) of the Act.[1]  He has also complied with the notice requirements of Section 12652(d)(C)(i)-(ii) of the Act.  Specifically, prior to filing suit, Mr. Taylor provided the entire LAFP Board draft copies of his Original Complaint, along with a disclosure package that included records detailing the fraud alleged herein.  Mr. Taylor then conferred with the Los Angeles City Attorney regarding the allegations in his draft Complaint.  Despite having been afforded the opportunity to take independent action to address the fraud Mr. Taylor disclosed, LAFP opted not to do so prior to the filing of this suit.

8.      Deutsche Bank, AG is a Frankfurt, Germany-based investment-banking firm with its principal place of U.S. business located in New York, New York.  Deutsche Bank, AG received, paid, or arranged kickbacks on investment business from LAFP.

---

[1] Mr. Taylor also blew the whistle on rampant "pay-to-play" investment fraud in the State of New Mexico, and was an original source of critical information that was later reported in connection with investigations of that fraud.

PLAINTIFF'S SECOND AMENDED QUI TAM COMPLAINT

1512280.1

9.      DB Investment Managers, Inc. ("DB Investment") is a corporation with its principal place of business in New York, New York.  DB Investment, a Deutsche Bank, AG subsidiary, entered into an illegal "pay-to-play" agreement with Marc Correra's company, Cabrera Capital Markets, Inc., that paid Mr. Correra outsized fees in return for Mr. Correra's agreement to steer public pension fund dollars to funds managed by DB Investment, including the Topiary Trust.  Mr. Correra then enlisted the aid of co-conspirators to perpetrate the same fraud on LAFP.

10.      DBAH Capital, LLC is a New York limited liability company.  Deutsche Bank AG acquired its controlling interest in Aldus through DBAH Capital.

### III.
### JURISDICTION AND VENUE

11.      The Court has diversity jurisdiction over this matter because the parties are citizens and residents of different States, and because the amount in controversy exceeds the minimum jurisdictional limit of the Court.

12.      Venue is proper in this Court because Plaintiff is a political subdivision located in this District, and because all or a substantial part of the acts and omissions that give rise to this suit occurred in this District.

### IV.
### FACTUAL BACKGROUND

**A.      Aldus Is Formed To Act As Gatekeeper For Public Pension Funds' Private Equity Investments**.

13.      Aldus was founded in 2003 by Saul Meyer and Matthew O'Reilly.  As a private equity gatekeeper for public pension funds, Aldus directed public pensions' investments in a variety of private equity funds.

14.      Mr. Taylor joined Aldus in February 2004 as an equity partner.  Thereafter, Messrs. Meyer, O'Reilly, and Taylor served as the key executives of Aldus. Mr. Taylor was responsible for due diligence on investments in African-American and Hispanic private equity firms, while Mr. Meyer focused on client development and Mr. O'Reilly oversaw firm compliance with securities laws.

PLAINTIFF'S SECOND AMENDED QUI TAM COMPLAINT

1512280.1

15.     In 2004, Aldus secured private equity consulting contracts with several prominent public pensions, including New Mexico Retirement, New York Retirement, New York City Retirement, Fort Worth Retirement, San Antonio Retirement, and Texas Safekeeping Trust.

16.     From 2004 to 2006, Aldus rapidly expanded its business and secured additional private equity contracts from a number of prominent public pensions and Fortune 500 companies, including the California Public Employees Retirement and Wal-Mart, Inc.

17.     By Summer 2006, Aldus had grown from a fledgling start-up to a major Wall Street private equity player, with over $3 billion of capital under management and fifteen investment professional employees.  Aldus also benefitted from a strong pipeline of new pension client prospects, including New Jersey Retirement, Texas Teachers Retirement, Oklahoma Teachers Retirement, and LAFP.

18.     Then Deutsche Bank came calling.

**B.     Deutsche Bank Targets Aldus To Accelerate Its Foray Into The Public Pension Investment Arena.**

19.     Deutsche Bank, AG is one of the world's largest banks.  It operates from over 3,000 branch locations in more than 70 countries, and has over $700 billion of capital under management.

20.     In 2006, private equity was one of the hottest and most profitable asset classes on Wall Street.   Most of the other bulge-bracket investment banks maintained substantial private equity divisions, and Deutsche Bank, AG was at a competitive disadvantage because it had no significant private equity practice.  As a German bank, Deutsche Bank, AG had been unable to crack the large and lucrative public pension market.

21.     To better compete with its Wall Street rivals, Deutsche Bank, AG sought to aggressively expand both into private equity and the public pension fund arena.  Rather than build out a private equity subsidiary from the ground up, Deutsche Bank accelerated its foray into these markets by pursuing an acquisition of an established private equity consulting firm that had already garnered a critical mass of public pension assets.

1512280.1

22.     To lead the effort, Deutsche Bank tapped Cesar Baez, then head of private equity for New Jersey Retirement, to build out a market-leading private equity division for Deutsche Bank.

23.     Prior to joining Deutsche Bank, Mr. Baez had already formed a close personal friendship with Mr. Meyer, who had spent over a year soliciting a $300 million private equity contract from New Jersey Retirement.  Together, the two demonstrated an eagerness to engage in the same "pay-to-play" investment fraud that was later perpetrated on LAFP.

24.     Specifically, during his tenure at New Jersey, Mr. Baez agreed to a job offer from Mr. Meyer to join Aldus in exchange for a 20% stake in the company.  In return, Mr. Baez agreed to use his influence to steer a $300 million private equity contract from New Jersey to Aldus.

25.     Before finalizing his acceptance of Aldus' job offer, Mr. Baez changed his mind and instead joined Deutsche Bank as Global Head of Private Equity.

26.     Upon joining Deutsche Bank, Mr. Baez approached Mr. Meyer with a proposal for Deutsche Bank to acquire a controlling stake in Aldus.  In late 2006, Aldus accepted Deutsche Bank's initial Term Sheet Proposal to acquire control of Aldus in a two-part transaction in which DBAH Capital, LLC would acquire an initial 45% controlling stake in Aldus in 2007.  Aldus would become Deutsche Bank's "exclusive" private equity fund-of-fund and co-investment subsidiary.

**C.      Deutsche Bank Pressures Aldus To Re-Hire Aldus Partner Saul Meyer After He Is Terminated For Accepting An Illegal Kickback From Mr. Correra.**

27.     As Deutsche Bank was finalizing its Aldus acquisition in late 2006, Mr. Taylor orchestrated Mr. Meyer's termination from Aldus.   Mr. Meyer was terminated because he admitted in an audiotaped telephone conversation that he had accepted a $10,000 kickback from Mr. Correra.

PLAINTIFF'S SECOND AMENDED QUI TAM COMPLAINT

1512280.1

28. Two days after Mr. Meyer's termination, Messrs. Taylor and O'Reilly travelled to New York to personally notify a Deutsche Bank senior executive, Mr. Thomas Curtis, that Mr. Meyer had been terminated for that reason.

29. During this meeting, Mr. Curtis seemed genuinely stunned and disappointed that Mr. Meyer, Aldus' founding partner and primary rainmaker, had been terminated. However, he offered no reaction to the reason for the termination: accepting an illegal kickback from Mr. Correra.

30. The next week, Mr. Curtis and fellow Deutsche Bank executives Charles Leitner and Timothy Keith phoned Mr. Taylor to express their frustration about Mr. Taylor's decision to terminate Mr. Meyer without giving them any advance notice. They proceeded to aggressively bully Mr. Taylor to re-hire Mr. Meyer by threatening a lawsuit against Aldus and Mr. Taylor personally if he refused. Deutsche Bank followed up these verbal threats with a letter from its lawyers later that week, in which Deutsche Bank announced that if it were forced to break off the Aldus acquisition, it would sue Aldus and Mr. Taylor for all legal fees Deutsche Bank incurred in connection with the acquisition.

31. Deutsche Bank then promised Mr. Taylor that if Mr. Meyer were re-hired, Deutsche Bank would ensure that Aldus would be operated in full legal compliance because Deutsche Bank would take control over all of Aldus' investment activities, and had systems in place to ensure that no future misconduct would occur.

32. Believing that he had no other option, and relying on Deutsche Bank's promises, Mr. Taylor relented to Deutsche Bank's pressure tactics and agreed to re-hire Mr. Meyer.

33. At the same time Deutsche Bank was lying to Mr. Taylor about its rigorous compliance systems, Deutsche Bank was also concealing a critical fact, namely that just four months before Mr. Meyer's termination at Aldus, Deutsche Bank had partnered with Mr. Correra through a secret joint-venture marketing agreement with Mr. Correra's company, Cabrera Capital Markets. Deutsche Bank then used Correra's political connections to secure a $250 million hedge fund contract from New Mexico Retirement.

PLAINTIFF'S SECOND AMENDED QUI TAM COMPLAINT

1512280.1

34.     Mr. Correra's secret agreement with Deutsche Bank had all of the earmarks of "pay-to-play" fraud, as it called for the payment of outsized "placement fees" to a political operator with no investment expertise. Deutsche Bank's agreement with Mr. Correra called for Deutsche Bank to pay Mr. Correra a staggering 25% of all management fees and 25% of all carried interest earned on all hedge fund contracts Deutsche Bank and Mr. Correra captured. By way of comparison, most legitimate placement agents only receive a one-time fee of one-half of one percent (0.05%) of the total contract value, a small fraction of what Deutsche Bank agreed to pay Mr. Correra.

35.     Precedent examples in which an investment advisor like Deutsche Bank obtained a pension contract by allocating outsized economics to a politically-connected placement agent like Mr. Correra have resulted in not only civil liability, but also criminal prosecution. New York Attorney General Andrew Cuomo pursued felony securities fraud charges against Mr. Meyer for executing a similar secret agreement to pay New York placement agent Hank Morris 30% of all fees for a contract Mr. Meyer negotiated with New York Retirement. Mr. Meyer eventually pled guilty to felony securities fraud for this illegal conduct, and Hank Morris served two years in federal prison.

36.     Had Deutsche Bank disclosed its partnership with Mr. Correra to Mr. Taylor at the time Mr. Taylor informed Deutsch Bank that Mr. Meyer had been terminated for accepting a $10,000 kickback from Mr. Correra, Mr. Taylor would have never allowed Deutsche Bank to bully him into rehiring Mr. Meyer. Moreover, had Deutsche Bank informed Mr. Taylor at that time that Deutsche Bank intended to continue working with Mr. Correra even after it learned the man was a crook, Mr. Taylor would never have consented to Deutsche Bank's acquisition of Aldus, and the entire "pay-to-play" investment fraud Deutsche Bank eventually perpetrated on LAFP with the help of Mr. Correra and his co-conspirators would have been avoided.

37.     Because Deutsche Bank fraudulently concealed the truth, it wasn't until late 2012, when Mr. Taylor finally obtained an actual copy of Deutsche Bank's secret agreement with Mr. Correra, that Mr. Taylor first learned about Deutsche Bank's central

role in the massive fraud perpetrated on LAFP by Deutsche Bank, Mr. Correra, and his cronies.

**D.   Deutsche Bank Shields Mr. Meyer After Acquiring Its Controlling Stake In Aldus.**

38.     In March 2007, Deutsche Bank filed disclosures with the U.S. Securities & Exchange Commission stating that Deutsche Bank owned a "controlling" interest in Aldus, and recognized Aldus as a Deutsche Bank subsidiary.

39.     In its role as Aldus' controlling shareholder, Deutsche Bank aligned with Mr. Meyer by designating him as the "sole" contact for all official Deutsche Bank communication with Aldus.   It was as if Aldus' other partners did not exist in Deutsche Bank's eyes.

40.     Deutsche Bank also required the other Aldus partners to sign an "Agreement Among Owners" guaranteeing that the Aldus partners would not terminate Mr. Meyer in the future for any reason.   After freezing out Aldus' non-corrupt partners, Deutsche Bank was free to implement its "pay-to-play" securities fraud on LAFP.

41.     Thereafter, Deutsche Bank functioned as a hands-on, controlling owner of Aldus, and was intimately involved in all aspects of Aldus' investment operations.   Aldus was required to obtain Deutsche Bank's pre-approval on all key decisions, including (i) public pension RFP responses; (ii) public pension "pitch books"; (iii) hiring and firing of Aldus executives; and (iv) most importantly, corporate approval of all Aldus pension investments.

42.     As Aldus' largest owner, Deutsche Bank had both majority control and veto powers over Aldus' Investment, Audit and Compliance Committees.   Deutsche Bank executives Charles Leitner, Tim Keith, Charles Hughes, and Charles Smith all participated in Aldus' Monday morning investment committee meetings where investment decisions were made, and Deutsche Bank had final authorization powers over Aldus' investments, including investments for LAFP.   During these meetings, Mr. Taylor personally heard senior Deutsche Bank executives discussing Deutsche Bank's plan to

PLAINTIFF'S SECOND AMENDED QUI TAM COMPLAINT

1512280.1

transport to LAFP the same fraudulent investments Deutsche Bank had made on behalf of the New Mexico State Investment Council and New Mexico Education Retirement Board. By participating in internal Deutsche Bank/Aldus executive committee meetings, Mr. Taylor further learned that Deutsche Bank sought to downplay its role and influence over Aldus' investment committee to the LAFP Board. He has first-hand knowledge that Deutsche Bank refused to disclose its controlling interest in Aldus to the LAFP Board, and also has first-hand knowledge that Deutsche Bank refused to disclose its secret placement agent agreement with Mr. Correra to the LAFP Board.

### E. Deutsche Bank Implements Its "Pay-To-Play" Investment Fraud At LAFP.

43.     To perpetrate its fraud on LAFP, Deutsche Bank turned to Saul Meyer and Cesar Baez, and their network of California-based, politically-connected placement agents. In addition to his friendship with Mr. Meyer, Mr. Baez had also forged friendships with Julio Ramirez, Dan Weinstein, and Marvin Rosen. These personal connections laid the groundwork for the "pay-to-play" investment fraud that followed.

44.     Meyer and Baez's ties to Ramirez and Weinstein date back to Ramirez and Weinstein's tenures at Wetherly Capital, a Los Angeles-based equity placement firm.

45.     Ramirez and Weinstein agreed to use their local political connections to assist Deutsche Bank/Aldus in securing LAFP's private equity consulting contract. In return for their behind-the-scenes political assistance, Meyer and Baez agreed to invest LAFP capital into funds marketed by Ramirez and Weinstein.

46.     To advance the scheme, Weinstein leveraged his close personal relationship with Sean Harrigan, who served as LAFP's Board President (Weinstein and Harrigan had previously worked together at Yucaipa Companies, a Los Angeles-based private equity firm).

47.     Meanwhile, Ramirez leveraged his close personal relationship with LAFP Board Member Louis Moret.

48.     Weinstein and Ramirez's efforts quickly paid off. Deutsche Bank/Aldus was awarded LAFP's private equity consulting contract. Mr. Taylor has first-hand

PLAINTIFF'S SECOND AMENDED QUI TAM COMPLAINT

1512280.1

knowledge that that contract specifically provided that Deutsche Bank/Aldus would invest in a portfolio of private equity funds without influence from third-party conflicted interests.

49.    For its very first investment on behalf of LAFP, Deutsche Bank directed Aldus to invest $40 million in Apollo Advisors, a private equity fund that had hired Mr. Ramirez as its placement agent. Deutsche Bank's investment decision netted Ramirez an $800,000 placement fee. Deutsche Bank then directed Aldus to invest $30 million of LAFP funds in a private equity fund called Ares, which Mr. Weinstein represented as its placement agent. Deutsche Bank's investment decision generated a $600,000 payday for Weinstein. Mr. Taylor has first-hand knowledge that Deutsche Bank failed to disclose to LAFP that Ramirez and Weinstein acted as placement agents on these investments.

50.    Shortly before these capital placements, Deutsche Bank had made identical investments in Apollo Advisors and Ares on behalf of the New Mexico Education Retirement Board. Those investment decisions netted Correra $1.4 million in placement fees, which Correra then split 50/50 with Ramirez and Weinstein.   And this was only the beginning. Deutsche Bank went on to invest LAFP's capital into six other funds (Ares II, Platinum, LLCP, CDR, Thoma Bravo and Newstone), all of which were "recycled" New Mexico pay-to-play investments that enriched either Julio Ramirez or Dan Weinstein through their fee-splitting arrangement with Correra. Here again, Deutsche Bank never informed LAFP that Ramirez and Weinstein were placement agents on these investments, and failed to disclose the outsized placement agent fees being paid using LAFP's money.

51.    During this same time period, Deutsche Bank also invested LAFP's capital into two additional funds—AG Recovery and Odyssey—solely because they were marketed by Julio Ramirez, and again without disclosing Ramirez's role as placement agent to LAFP.

52.    Finally, Deutsche Bank steered LAFP investments into Vista Equity and Crestview, two funds that were secretly marketed by politically-connected placement agent

1512280.1

Marvin Rosen (who also previously shared fees with Correra on placement deals in New Mexico).[2]

53.     Deutsche Bank steered all of these LAFP investments as financial payback to Ramirez, Weinstein, and Rosen for their political assistance in convincing LAFP Board Members Harrigan and Moret to recommend Aldus to handle private equity consulting for LAFP.

**F.     Deutsche Bank Inflicts Hundreds Of Millions Of Dollars In Damages On LAFP Over The Lifetime Of These Fraudulent Investments.**

54.     Deutsche Bank's "pay-to-play" investment fraud inflicted three layers of damages on LAFP.

55.     First, from 2007 to 2009, Deutsche Bank directed the issuance of hundreds of millions of dollars in LAFP investment contracts solely to enrich Messrs. Ramirez, Weinstein, and Rosen, three politically-connected placement agents with close ties to Marc Correra, Deutsche Bank's secret joint venture partner.  All told, Deutsche Bank directed LAFP to invest $355 million of LAFP's capital into twelve different private equity funds solely because these funds paid placement fees to Julio Ramirez, Dan Weinstein or Marvin Rosen.  These fraudulent "pay-to-play" investments accounted for over 70% of all the capital that Deutsche Bank invested for LAFP during this time period.   At no time was the relationship between Deutsche Bank and Correra disclosed to LAFP, and at no time was LAFP informed that outsized placement agent fees were being paid to undisclosed placement agents using LAFP money.

56.     While the original investment decisions were made during the 2007 to 2009 timeframe, the capital was not placed all at once.  The investment agreements between LAFP and the various private equity funds described herein contemplated investments made over a six-year period.  After all capital is invested, the agreements remain in place

---

[2] A comprehensive chart detailing the years and amounts of Deutsche Bank investments made on behalf of LAFP is attached as Exhibit "A" and incorporated herein by reference. The chart—which Mr. Taylor provided to LAFP prior to filing suit—also includes, where applicable, the identities of undisclosed placement agents who represent the private equity funds that received LAFP investment capital.   The investment contracts underlying these fraudulent investments further detail the dates and amounts of fraudulent requests for payment made on LAFP.

for another six years, during which time the returns are harvested.  Thus, the investment contracts formed from 2007 through 2009 remain in place to this day.  Up to at least 2013, fund managers for the investment funds described herein have made periodic requests for payment from LAFP in the form of (1) capital calls to place LAFP capital in the private equity funds, and (2) management fees to pay the managers of funds who fraudulently received LAFP investment dollars.  Those requests for funds were made— and continue to be made—without disclosure of the secret role politically-connected placement agents played in Deutsche Bank's investment decisions.  Accordingly, these requests for payment are all fraudulent under the Act.

57.   In addition to massive capital commitments made on the basis of fraudulent investment recommendations, LAFP has also paid the private equity firms themselves more than $40 million in fraudulent management fees over the years these investments— which are ongoing to this day—have been in place.  Investment funds' requests for payment of those fees are also fraudulent, as they are made without disclosing the illicit relationship between themselves, their placements agents, and Deutsche Bank.

58.   Finally, Mr. Correra's co-conspirators Ramirez, Weinstein and Rosen personally received more than $7 million in fraudulent placement agent fees paid to directly by LAFP over the lifetime of the investments described herein.

59.   In addition to the massive damages caused from the submission of these fraudulent claims for payment, LAFP has also been damaged by certain of Deutsche Bank's recycled New Mexico investments that have underperformed relative to the broader private equity benchmarks and relative to the performance of other private equity firms who refused to engage in pay-to-play.  The ultimate losers in the scheme are the police and firefighters whose funds were placed in sub-par investments by LAFP at the direction of Deutsche Bank.

60.   LAFP is entitled to recover three times the amount of damages caused by these pay-to-play investments, along with civil penalties, costs and reasonable attorneys' fees, all as provided in the Act, plus pre- and post-judgment interest on the causes of action detailed herein.

PLAINTIFF'S SECOND AMENDED QUI TAM COMPLAINT

1512280.1

# V.
# <u>FIRST CAUSE OF ACTION</u>

## (Violation of False Claims Act § 12651(a)(1) - Against All Defendants)

61.     Plaintiff re-alleges and incorporates herein by reference each of the allegations set forth in paragraphs 1 through 60, inclusive, above.

62.     Defendants knowingly presented, or caused to be presented false or fraudulent claims for payment or approval by LAFP.  As explained above, the false claims for payment came in the form of fraudulent requests for capital contributions to various private equity funds, fraudulent requests for payment of management fees associated with those investments, and fraudulent requests for payment that did not include disclosure of placement agents affiliated with private equity funds that received LAFP investment capital.  These fraudulent capital placements occurred over a six-year period beginning in 2007.  The management fees have been paid throughout the term of the investments, and continue to be paid to this day.   Every request for a placement of equity capital, and every request for payment of a management fee, constitutes a distinct, fraudulent claim for payment from LAFP that Deutsche Bank actively conspired to obtain.

63.     These periodic fraudulent requests for payment—all made pursuant to the terms of the specific investment contracts governing each investment—stem from Deutsche Bank's initial investment recommendations made to LAFP for the following funds on the following dates (the undisclosed placement agent for each investment is identified in parentheses):[3]

- December 6, 2007: $40 million investment in Apollo Investment Fund VII, L.P. (Julio Ramirez)

- December 6, 2007: $35 million investment in Ares Distressed Securities Fund (Dan Weinstein)

- January 24, 2008: $30 million investment in Platinum Equity Capital Partners II, L.P. (Julio Ramirez)

---

[3] Mr. Taylor disclosed these investments—and the identities of the undisclosed placement agents associated with the investments—to the entire LAFP Board prior to filing this suit, and only filed this *qui tam* action after the individuals charged with responsibility to act opted not to bring suit.

PLAINTIFF'S SECOND AMENDED QUI TAM COMPLAINT

1512280.1

- February 21, 2008: $30 million investment in Vista Equity Partners Fund III (Marvin Rosen)

- March 20, 2008: $25 million investment in Levine Leichtman Capital Partners IV (Dan Weinstein)

- April 17, 2008: $20 million investment in Clayton, Dubilier & Rice VIII, L.P. (Julio Ramirez)

- August 21, 2008: $25 million investment in Crestview Partners II (Marvin Rosen)

- October 16, 2008: $20 million investment in Thoma Bravo Fund IX (Julio Ramirez)

- January 22, 2009: $35 million investment in AG Capital Recovery Partners VII (Julio Ramirez)

- January 22, 2009: $35 million investment in Newstone Capital Partners II, L.P. (Julio Ramirez)

- February 19, 2009: $22.5 million investment in Odyssey Investment Partners Fund IV, L.P. (Julio Ramirez)

- February 19, 2009: $30 million investment in Ares Corporate Opportunities Fund III, L.P. (Dan Weinstein)

## VI.
## SECOND CAUSE OF ACTION

### (Violation of False Claims Act § 12651(a)(2) - Against All Defendants)

64.    Plaintiff re-alleges and incorporates herein by reference each of the allegations set forth in paragraphs 1 through 63, inclusive, above.

65.    Defendants knowingly made, used, or caused to be made or used false records or statements material to the false or fraudulent claims alleged herein.

## VII.
## THIRD CAUSE OF ACTION

### (Violation of False Claims Act § 12651(a)(3) - Against All Defendants)

66.    Plaintiff re-alleges and incorporates herein by reference each of the allegations set forth in paragraphs 1 through 65, inclusive, above.

67.     Defendants conspired with the undisclosed placement agents and private equity funds identified herein to commit violations of the Act.  That conspiracy was formed in 2007, involved fraudulent requests for payment from LAFP in the form of capital calls up to 2013, and, to the extent management fees continue to be paid by LAFP, continues to this day.  Deutsche Bank executives Charles Leitner, Tim Keith, Charles Hughes, and Charles Smith all actively participated in the conspiracy to defraud LAFP.

## VIII.
## FOURTH CAUSE OF ACTION

### (Violation of False Claims Act § 12651(a)(8) - Against All Defendants)

68.     Plaintiff re-alleges and incorporates herein by reference each of the allegations set forth in paragraphs 1 through 67, inclusive, above.

69.     Alternatively, as a beneficiary of an inadvertent submission of a false claim, and having subsequently discovered the falsity of the claim, Defendants failed to disclose the false claim to LAFP within a reasonable time after discovery.

## IX.
## JURY DEMAND

70.     Mr. Taylor demands a trial by jury on behalf of Plaintiff.

## X.
## PRAYER

WHEREFORE, Plaintiff prays for:

a.      Actual damages in amounts to be determined at trial;

b.      Rescission of the investment transactions described in this complaint, including the return of the consideration paid by LAFP;

c.      Disgorgement and restitution of all fees or other compensation received from whatever sources by Defendants as a result of LAFP's investments;

d.      Pre- and post-judgment interest;

e.      Trebling of the foregoing amounts as provided by the Act;

f.      The costs of this civil action;

g.      Reasonable attorney fees, including the fees of the Attorney General, LAFP, and counsel for the qui tam plaintiff;

h.      Awards distributing the proceeds of this action or any related settlement in accordance with the Act;

i.      Disqualification of Deutsche Bank and any Deutsche Bank affiliate from any future awards of California state contracts; and

j.      Such other and further relief as may be necessary or appropriate.


DATED: August 28, 2015

CASWELL & CANNON

By: */s/ Ronald S. Caswell*
Ronald S. Caswell
1625 Warnall Avenue, Suite 100
Los Angeles, California 90024
Telephone:  (310) 282-8150
Facsimile:   (310) 282-8140

COWLES & THOMPSON, P.C.

By: */s/ Todd J. Harlow*
Todd J. Harlow (*admitted pro hac vice*)
901 Main Street, Suite 3900
Dallas, Texas 75202
Telephone: (214) 672-2138
Facsimile: (214) 672-2338


Attorneys for Qui Tam Plaintiff,
MARCELLUS TAYLOR

PLAINTIFF'S SECOND AMENDED QUI TAM COMPLAINT

1512280.1